# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| MATTHEW WADE PARRISH,<br><br>    Plaintiff,<br><br>vs.<br><br>JASON DINGMAN, Individually and in his Official Capacity as Hamilton County Jailer, et al.,<br><br>    Defendants. | No. C16-3095-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT** |

## I.  INTRODUCTION

This case is before me on defendant's motion (Doc. No. 21) for summary judgment. Plaintiff Matthew Parrish has filed a resistance (Doc. No. 37) and the defendants have filed a reply (Doc. No. 44). I find that oral argument is not necessary. *See* N.D. Ia. L.R. 7(c).

## II.  PROCEDURAL HISTORY

Parrish filed this action in the Iowa District Court for Hamilton County on August 19, 2016. His state court petition (Doc. No. 3) includes claims against Hamilton County, Iowa (the County), Jason Dingman, a jailer at the Hamilton County Jail, and Dennis Hagenson, the Hamilton County Sheriff. Counts I, II and III are brought against Dingman pursuant to 42 U.S.C. § 1983 and assert violations of Parrish's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Counts IV and V, also brought pursuant to § 1983, assert that Hagenson and the County are liable for Dingman's alleged conduct. Counts VI and VII assert state law tort claims against

Dingman. Count VIII asserts a state law negligence claim against Hagenson and the County and Count IX asserts a respondeat superior claim against the County.

Defendants filed a notice (Doc. No. 2) of removal to this court on September 7, 2016, and filed an answer (Doc. No. 5) on September 14, 2016. Defendants generally deny Parrish's allegations and assert various defenses. Defendants filed their motion for summary judgment on July 21, 2017.

## III. RELEVANT FACTS

Unless otherwise noted, the parties do not dispute the following facts:

At the time of the events at issue, Parrish was 46 years old and on Social Security disability because of injuries sustained in a 2010 motorcycle accident. Doc. No. 24 at 5-6, 10. He was 5 feet, 8 inches in height, and weighed 170 pounds. Doc. No. 37-4 at 6. Despite being on disability, Parrish was able to maintain a part-time job at an automobile dealership. Doc. No. 24 at 6, 20-21.

The injuries Parrish suffered as a result of the motorcycle acceding included a broken right femur and right arm. Doc. No. 24 at 10. Because of these injuries, Parrish walks with a limp. *Id.* Parrish also has physical limitations in his wrist and double vision as a result of the accident. *Id.* Although Parrish used a walker or a cane immediately after the motorcycle accident, he was no longer using either on August 7, 2015. *Id.* at 10. However, he still wears orthopedic shoes and special glasses. *Id.*

Dingman was hired as a jailer at the Hamilton County Jail in 2006. Doc. No. 24 at 24. When he was hired, Dingman received training in the use of pepper spray and tasers. *Id.* In 2007, Dingman completed the basic 40-hour jail training at the State of Iowa Law Enforcement Academy. *Id.* at 25. Dingman takes a 20-hour re-certification course through the Law Enforcement Academy each year. *Id.* Dingman completed training in defensive tactics in 2008 and repeated the course in 2011 and 2015. *Id.*

The Hamilton County Jail maintains a policy regarding the use of force against inmates. Doc. No. 24 at 67-68. The policy states that "Jail Officers are so authorized and should use appropriate force when an escape is in progress, and it is evident that escape may ensue, or that danger to persons, or damage to property may ensue." *Id.* at 67. "Empty Handed Tactics" such as the use of hands, compliance holds or decentralizing are specifically authorized where the inmate shows passive or defensive physical resistance. *Id.* at 68. Intermediate weapons (such as pepper spray or a taser) are further authorized where an inmate demonstrates active physical resistance. *Id.*

On August 7, 2015, Parrish was arrested by Officer J. Johnson of the Iowa State Patrol after being stopped at an OWI checkpoint on Highway 17 near Stanhope, Iowa. Doc. No. 24 at 8. Parrish denies that he was under the influence of marijuana or alcohol at the time he was arrested, but admits that he was taking prescription narcotics, including hydrocodone. *Id.* at 7. Johnson ultimately transported Parrish to the Hamilton County Jail after a search of his car revealed marijuana and open beer cans. *Id.* at 9.

Upon arrival, Parrish had to sit on a chair in the jail's garage for approximately 45 minutes until he could be booked into the jail. *Id.* at 11. Eventually, he was moved to booking and Dingman began the process of checking him into the jail. Doc. No. 24 at 11. Parrish testified that he knew Dingman prior to August 7, 2015, because their mothers went to nursing training together. Doc. No. 24 at 10. However, they had never socialized. *Id.* Dingman testified that he knew of Parrish from the time he was a child and was aware that Parrish suffered serious injuries due to the motorcycle accident. *Id.* at 26. Dingman also testified that he noticed that Parrish walked with a limp. *Id.* at 31.

During booking, Parrish requested permission to keep his orthopedic shoes and his glasses, which was granted. Doc. No. 24 at 11. Parrish also requested to be placed in isolation, as he believed he would be unable to defend himself if housed with another inmate due to his various conditions. However, Parrish is not certain that he made the

3

reason for his request clear to Dingman. Specifically, Parrish testified that he recalled telling Dingman that he wanted to "be in isolation because of [his] physical injuries," but does not "recall saying [he wanted to be in isolation] so [he] could protect [himself]." Doc. No. 24 at 12. Dingman does not recall Parrish making this request during the booking procedures. Dingman testified that Parrish was cooperative at this time (Doc. No. 24 at 27-28) and Parrish testified that Dingman was polite and professional during the booking process (Doc. No. 24 at 11).

Parrish was given a mattress to carry, which he was able to do. Doc. No. 24 at 12-13. Dingman directed Parrish to a cell with another inmate already in it. A video recording (Video), submitted as an exhibit to defendants' motion, depicts the events that occurred next. Parrish walked through the open door of the cell while Dingman was behind him. Video, 11:45-11:46. Parrish was carrying the foam mattress at this time. *Id*. Although there is no audio, it is plain from the video that Parrish walks into the cell, notices that it is occupied by a sleeping person, and then turns around to face Dingman. *Id*. Dingman is seen to be shaking his head "no." *Id*.; *see also* Doc. No. 24 at 15. Dingman and Parrish testified that this was in response to a request to be put in isolation. Doc. No. 24 at 13-14, 31.

Parrish, who was not far from the door, stepped forward into the door frame with his mattress in front of him. Video at 11:46; Doc. No. 24 at 30. Dingman testified that the mattress made contact with his chest, although admittedly not with much force. Doc. No. 24 at 28. While Dingman and Parrish both testified that at least the mattress was through the door, from the video it also appears that Parrish himself was within the door frame. Video at 11:46; Doc. No. 24 at 14-15 ("Q. The mattress was outside the doorway, and that was in front of you; correct? A. Yes. . . . I made motion towards the doorway to get the jailer's attention . . . ."); *Id*. at 30 ("I could not close the door because the mattress got into the door frame). Dingman testified that he believed the mattress was

4

"being used as a shield to interfere with my ability to stop [Parrish] from leaving the cell . . . . [I]t interferes with my ability to protect myself." *Id.* at 30. Dingman testified that he believed Parrish intended to exit the cell at this time. *Id.*; *see also* Doc. No. 37-4 at 4 ("Inmate Parrish then thrust his mattress forward towards me and tried to shove his way past me in an attempt to extricate himself from the holding cell.").

Dingman stepped into the cell, pushing Parrish against the wall briefly before leveraging him to the ground, with his hands on Parrish's arm and neck, and cuffing his wrists behind his back. Video at 11:46-47; Doc. No. 24 at 15 ("Q. He never just threw you down and let go; correct? A. No. He was right on top of me the whole time."); Doc. No. 37-4 at 4. Parrish agrees that Dingman never tased him, used pepper spray on him or physically hit him. Doc. No. 24 at 17. Instead, the sole basis for his complaint is the takedown seen on the video at 11:46-47.[1] *Id.*

Parrish testified that he injured his lower back as a result of this incident. Doc. No. 24 at 17. Specifically, four ribs were "out on one side" requiring chiropractic treatment. *Id.* Parrish saw a chiropractor, Dr. Lee, weekly for six months following the incident but testified that his injuries were resolved in "about a month or a little less." Doc. No. 24 at 19-20. Parrish also states that his wrists, particularly the right wrist, were swollen and bruised as a result of being handcuffed (*id.*), and that he suffered emotional trauma (Doc. No. 37-4 at 25).

X-rays of Parrish's wrist, taken August 8, 2015, were normal. Doc. No. 24 at 17-18. Parrish testified that he returned to physical therapy to treat his right wrist—the

---

[1] While Parrish's state court petition and interrogatory answers include allegations that Dingman told him he was being too demanding or too picky during the physical altercation (Doc. No. 3 at ¶ 13; Doc. No. 24 at 61; Doc. No. 37-4 at 17), Parrish testified that he could not recall Dingman making those statements (Doc. No. 24 at 21). Dingman testified that he never made these statements. *Id.* at 26.

5

same wrist that required treatment after the motorcycle accident. *Id*. Parrish missed a couple of weeks of work following his arrest. *Id*. at 21. Finally, Parrish testified that he took Clonazepam, an anti-anxiety medication, for a few months after the arrest. *Id*.

## IV.  SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine. Put another way, "'[e]vidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The parties "may not merely point

to unsupported self-serving allegations." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. *Id*. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id*. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996)). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick*, 90 F.3d at 1377.

## V. ANALYSIS

Defendants argue that there are no genuine issues of material fact for trial and that summary judgment is appropriate for multiple reasons. With regard to Count I, they allege that the use of force at issue was objectively reasonable. They further contend that Parrish has failed as a matter of law to establish viable claims with regard to Counts II and III. They then argue that Counts IV and V must fail in the absence of an underlying constitutional violation and that the various state law claims must be disposed of on similar grounds. Parrish resists, arguing primarily that the use of force was not reasonable under these circumstances.

### A. *Count I (Unreasonable Seizure, 42 U.S.C. § 1983)*

Parrish claims that Dingman "utilize[ed] unnecessary and excessive force against [him], by slamming him into the ground in response to reasonable requests to accommodate [his] disabilities . . . because the severity of perceived offense was minimal and the situation posed no threat of harm to officers or others." Doc. No. 3 at ¶¶ 27-28. As a result, Parrish argues, Dingman deprived him of his Fourth Amendment right to be free from unreasonable seizures. *Id.* at 4. Dingman responds that the use of force was reasonably justified by the perceived threat of Parrish exiting his cell. In the alternative, Dingman responds that he is entitled to qualified immunity on this claim.

Qualified immunity shields a government official from individual liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004). "The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis*, 375 F.3d at 711-12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Officials are not liable for bad

guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). To determine whether Dingman is entitled to qualified immunity, courts ask (1) whether the facts alleged or shown, construed in the light most favorable to Parrish, establish a violation of a constitutional or statutory right, and (2) whether that constitutional right was clearly established as of the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity. Thus, I will first consider whether there was a constitutional violation. *Krout v. Goemmer*, 583 F.3d 557, 563-64 (8th Cir. 2009) (explaining the initial inquiry as "whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional . . . right").

Parrish was a post-arrest, pre-trial detainee at the time of the incident. The Fourth Amendment's "objective reasonableness" standard applies to excessive-force claims that arise before the end of a detainee's booking process, *Davis v. White*, 794 F.3d 1008, 1011-12 (8th Cir. 2015), and to due process claims made by pretrial detainees. *Kinglsey v. Hendrickson*, 135 S. Ct. 2466, 2472-74 (2015). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (quoting *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006); and citing *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004); *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)).

The parties dispute whether Parrish's right to be free from the use of excessive force was violated. The standard to apply in excessive force cases is well-settled:

> The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. [*Graham v. Connor*, 490 U.S. 386, 397 (1989)]. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. *Id.* at 396.

*Malone v. Hinman*, 847 F.3d 949, 952 (8th Cir. 2017) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)). The court has also explained, "[t]his calculus allows for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown*, 574 F.3d at 496 (quoting *Graham*, 490 U.S. at 397); *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) (same).

This reasonableness standard "is viewed from the vantage point of the police officer at the time of arrest or seizure." *Gill v. Maciejewski*, 546 F.3d 557, 562 (8th Cir. 2008) (citing *Wertish v. Kruegger*, 433 F.3d 1062, 1066 (8th Cir. 2006)); *see also Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) ("The aforementioned reasonableness of force is judged from the perspective of the officer on the scene, taking into consideration the facts known to him, as opposed to one possessing the illuminating power of hindsight.") (citing *Nelson v. Cnty. of Wright*, 162 F.3d 986, 989 (8th Cir. 1998). "Determining whether the forced used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). "Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396). The court may also "consider the result of the force," *id.* (citing *Littrell*, 388 F.3d at 583), "the extent of the suspect's injuries," *Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007) (citing *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003)), "as well as standard police procedures." *Mann*, 497 F.3d at 826 (citing *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995).

Judging the reasonableness of Dingman's use of force from the perspective of a reasonable jailer in his position, and viewing the facts in the light most favorable to Parrish, I conclude that Dingman's conduct was objectively reasonable. The use of force was reasonable because Dingman had cause to believe Parrish was attempting to leave his cell when he was not authorized to do so. *See, e.g., Vester v. Hallock*, 864 F.3d 884, 887 (8th Cir. 2017); *Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011). In *Vester*, the Eighth Circuit held that the use of the arm-bar maneuver against the plaintiff was reasonable:

> Although Vester neither visibly possessed a weapon nor attempted to resist arrest prior to the takedown, a variety of factors suggest that the amount of force Hallock employed was reasonable under the circumstances. Particularly relevant are the severity of Vester's criminal conduct of threatening to stab various individuals, his refusal to comply with Hallock's repeated commands, the very real possibility that he still had a concealed knife on his person after exiting the vehicle, the resulting potential threat to Hallock's safety, and the fact that Hallock was making the arrest without any backup.

*Id.* at 884. In *Hicks*, the Eighth Circuit held that it was reasonable for the defendant to use an arm-bar maneuver to take the plaintiff to the ground when the plaintiff "refused to comply with directions, loudly abused the correctional officers, and aggressively leapt toward" the defendant. 640 F.3d at 842. Under those circumstances, it was "reasonable

11

for [defendant] to believe Hicks constituted a threat to his safety and that his effort to subdue Hicks by means of the arm-bar maneuver was a reasonable use of force." *Id*.

By contrast, in *Brown* the Eighth Circuit held that the use of a stun gun against a nonviolent misdemeanor arrestee, who was not fleeing or resisting arrest, was an unreasonable use of force under the Fourth Amendment. 574 F.3d at 499. The plaintiff had remained seated in her car and had not made any movements towards the officer. Thus, no reasonable officer could have perceived a threat to safety. *Id*. The only noncompliance was the plaintiff's failure to follow orders to terminate her phone call with a 911 operator. *Id*.

The facts here are more similar to those in *Vester* and *Hicks* than to those in *Brown*. Parrish was lawfully arrested, booked and placed in a holding cell. As the door to that cell was closing, Parrish stepped towards it, holding a foam mattress in front of him, and attempted to keep it from closing so that he could repeat his request for a single cell. Whether or not the mattress actually touched Dingman, he could reasonably assume that the mattress would serve as a shield in the event Parrish attempted to leave his cell. In any event, the mattress and Parrish's location in the cell door prevented Dingman from closing the door. By placing himself in that position, Parrish was actively and physically resisting lawful police action. Dingman complied with jail policy by using "hands," "compliance holds" and "decentralizing" to ensure that Parrish did not leave his cell and that he would not pose further risk to others. Parrish suffered only minor physical injuries[2] and Dingman did not use the greater force that the jail's handbook may have authorized in cases of active physical resistance (impact weapons or chemical agents).

---

[2] Although the degree of injury is not relevant to whether there was a constitutional violation, the fact that an injury is relatively mild may be useful to determine whether the force used was reasonable. *Chambers v. Pennycook*, 641 F.2d 898, 903 (8th Cir. 2011).

Parrish further argues that even the slight use of force by Dingman was unjustified because, subjectively, Parrish did not intend to leave his cell. Rather, Parrish intended to ask for the further accommodation of a private cell. Parrish's subjective intent is irrelevant. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) ("an arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior" (citing *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012))). Also irrelevant is Parrish's contention that Dingman's use of force was a response to his repeated requests for accommodations. *See, e.g., Hicks*, 640 F.3d at 842 n.8 ("Because our inquiry turns on the objective reasonableness of Captain Norwood's conduct, Hicks's protestations that Captain Norwood 'use[d] … brute force to satisfy his ego' and 'viewed Mr. Hicks as being not valuable' have no bearing on our analysis."); *Wilson*, 209 F.3d at, 717 ("Evidence of statements allegedly made by Officer Spain might show that Spain was angry with Wilson, or even that Spain threatened Wilson, but Spain's mental state is not relevant to the objective reasonableness of his actions.").

As a matter of law, Dingman did not violate Parrish's constitutional rights through the use of excessive force. Count I fails as a matter of law.

### B. *Count II (Bodily Integrity, 42 U.S.C. § 1983)*

In his state court petition, Parrish alleges that by failing "to respond proportionally to a simple request for accommodation of [his] disabilities," when "Dingman knew or should have known that such an overreaction would result in an increased harm to disabled citizens like [Parrish]," Dingman violated his Fifth and Fourteenth Amendment right to bodily integrity. Doc. No. 3 at ¶¶ 34-36. Dingman argues that his actions did not rise to the requisite level of shocking the conscience and that they were reasonably justified by the perceived threat of Parrish exiting his cell. In the alternative, Dingman

13

argues that he is entitled to qualified immunity. Parrish did not respond to Dingman's arguments as to this claim.

"The Supreme Court has recognized a substantive due process right to bodily integrity . . . ." *Rogers v. City of Little Rock*, 152 F.3d 790, 795 (8th Cir. 1998) (citing *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 287-88 (1990) (O'Connor, J., concurring)). For governmental interference to violate a person's protected liberty interest in bodily integrity under the Fourteenth Amendment, the interference must be so severe that it shocks the conscience. *Id.* at 797, *see also Rochin v. California*, 342 U.S. 165, 172 (1952). "[W]hether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan*, 497 U.S. at 279 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

In *Rogers*, an on-duty police officer sexually assaulted a woman he had stopped for a traffic violation. 152 F.3d at 796. The Eighth Circuit found that the officer violated the plaintiff's due process right to bodily integrity, holding his conduct was easily classified as brutal, wantonly cruel or coercive so as to shock the court's conscience, while serving no legitimate policing purpose. *Id.* Unlike the unfathomable sexual assault in *Rogers*, there are legitimate police purposes that could be served by the takedown action Dingman employed. *See, e.g., Smith v. Conway Cnty.*, 759 F.3d 853, 858-59 (8th Cir. 2014) (analyzing the amount of force appropriate in a prison setting to determine whether it "was applied in a good-faith effort to maintain or restore discipline"). Thus, I must consider whether the conduct was "justifiable by any government interest" and whether it shocks the conscience.

Dingman argues that the undisputed evidence demonstrates that his conduct was justified by the governmental interest of ensuring discipline and order in its jails and was not "conscience shocking." I agree. Parrish was taken down and handcuffed after

14

impeding Dingman from closing the door to jail cell and seemingly attempting to walk out of the cell. Under these circumstances, Dingman's actions were justified by the governmental interest of ensuring discipline and order in its jails.

Further, while it is possible that less force may have been enough to ensure Parrish's compliance, the force that Dingman used was not so out of proportion or excessive as to be "conscience shocking." Dingman did not use a weapon. Parrish and Dingman both testified that Dingman did not throw Parrish to the ground, but rather used a technique in which he was trained to leverage Parrish to the ground while keeping his hands on Parrish at all times.

As a matter of law, Dingman did not violate Parrish's Fifth and Fourteenth Amendment rights to bodily integrity. Count II fails as a matter of law.

### C.  *Count III (Failure to Protect, 42 U.S.C. § 1983)*

Parrish alleges that "Dingman's gross overreaction to a simple request created and/or enhanced the harm [he] sustained, and otherwise failed to protect [his] clearly established life, liberty, and property interests guaranteed by the Fifth and Fourteenth Amendments." *Id.* at ¶ 44. Dingman responds that the evidence does not establish a claim for failure to protect. He also argues that Parrish has not come forward with evidence that would allow a reasonable jury to find that Dingman violated his duty towards Parrish.

In *Burton v. Richmond*, 370 F.3d 723 (8th Cir. 2004), the Eighth Circuit explained the circumstances under which the state may be held liable for failure to protect:

> The state does not have a general duty to protect individuals from harm at the hands of private actors. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). A substantive due process right to protection can arise under two theories. Under the first theory, the state may owe a duty to protect individuals in its custody. *Gregory v. City of Rogers*, 974 F.2d 1006 (8th Cir. 1992) (en banc), *cert. denied*, 507 U.S.

913 (1993). Under the second, the state may owe a duty to protect individuals if it created the danger to which they become subject. *Id.*; *see also S.S. v. McMullen*, 225 F.3d 960, 962 (8th Cir. 2000) (en banc) ("[I]f the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced, the state actor, depending on his or her state of mind, may have committed a constitutional tort."), *cert. denied*, 532 U.S. 904 (2001).

*Burton*, 370 F.3d at 727. Under the "custody" theory, liability can be imposed only "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney*, 489 U.S. at 200.

Parrish did not respond to Dingman's arguments concerning Count III. Nor has he pointed to any facts supporting either theory of recovery described in *Burton*. As a matter of law, Dingman did not violate Parrish's Fifth and Fourteenth Amendment rights by failing to protect him. Count III fails as a matter of law.

### D. *Count IV (Policy, Practice and Custom, 42 U.S.C. § 1983) and Count V (Negligent Training or Supervision, 42 U.S.C. § 1983)*

In Count IV, Parrish claims that Hagenson and Hamilton County "established, maintained, and/or enforced official policies, patterns, practices or customs of allowing unreasonable or excessive force, particularly when it comes to treatment of those confined in the Hamilton County Jail." Doc. No. 3 at ¶ 53. Further, Parrish alleges that "Hagenson failed to enforce existing policies and implement policies ensuring the rights of Plaintiff would not be violated when jailers, namely defendant Dingman, deployed force in the jail." *Id.* at ¶ 55. Parrish claims that this behavior constituted a "deliberate indifference to and/or reckless disregard of Plaintiff's constitutional rights." *Id.* at ¶ 58.

In Count V, Parrish alleges that Hagenson and Hamilton County "failed to train and/or supervise properly Defendant Dingman when employing force in jail." Doc. No.

3 at ¶ 65. Further, "Defendants' systematic failure to train and/or supervise properly demonstrated a reckless disregard and deliberate indifference to the rights of [Parrish] and "Defendants authorized the actions of Defendant Dingman by failing to train and/or supervise him in a manner which preserves the rights of [Parrish]." *Id.* at ¶¶ 68-69.

Defendants argue that if there is no underlying constitutional violation, there can be no liability for the supervisory defendants under a claim for policy, practice and custom, or for failure to train and/or supervise. In addition, defendants refer to the policies at issue, as well Dingman's testimony regarding his training. They argue that no reasonable jury could find that the established policies of the Hamilton County jail rise to the level of deliberate indifference to and/or reckless disregard of Parrish's constitutional rights, or that there was a lack of training or supervision in this case. As with Counts II and III, Parrish did not respond to defendants' arguments.

Defendants are correct that Counts IV and V are foreclosed by my findings that Dingman did not violate Parrish's constitutional rights. "Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* [*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)] . . . municipal liability." *Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) (quoting *Sanders*, 474 F.3d at 527; and citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Ambrose*, 474 F.3d at 1077 n.3). Moreover, even if Counts IV and V were not legally foreclosed, no reasonable jury could find in Parrish's favor on those claims. Parrish has developed no facts demonstrating that Hagenson or Hamilton County established a policy or practice of violating inmates' constitutional rights, or that Hagenson or Hamilton County failed to train or supervise Dingman properly. Based on the undisputed facts of record, Hagenson and Hamilton County are entitled to summary judgment on Counts IV and V.

## E.     *Counts VI-IX (State Law Claims)*

Parrish brings four claims under state law: assault and battery against Dingman (Count VI), negligence against Dingman (Count VII), negligence against Hagenson and Hamilton County based on a failure to train or supervise Dingman (Count VIII), and respondeat superior against Hamilton County (Count IX). Defendants argue that Iowa law immunizes each of the defendants from liability for these claims. Doc. No. 22 at 32-33 (citing Iowa Code §§ 670.4(c) and 804.13).

In response, Parrish addresses only Count VI and Count IX. Regarding Count VI, he incorporates his excessive force arguments to argue that he has a viable claim against Dingman for assault and battery. Doc. No. 37-1 at 12-13. As for Count IX, Parrish argues that Hamilton County is liable for the alleged assault and battery based on respondeat superior. *Id.* at 13-15.

Iowa Code § 804.13 states, in pertinent part:

> A peace officer or other person who has an arrested person in custody is justified in the use of such force to prevent the escape of the arrested person from custody as the officer or other person would be justified in using if the officer or other person were arresting such person.

Iowa Code § 804.8 states:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

Over thirty years ago, the Iowa Supreme Court concluded that due to § 804.8, "an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civil Serv. Comm'n*, 352 N.W.2d 252, 257 (Iowa 1984). The Iowa Court of Appeals has held that the statute establishes an "objective reasonableness" standard for the use of force by arresting officers, finding

18

support in the United States Supreme Court's "qualified immunity" standard for "excessive force" claims. *See Chelf v. Civil Serv. Comm'n*, 515 N.W.2d 353, 355-56 (Iowa Ct. App. 1994) (citing *Graham* 490 U.S. at 396-97). Under Iowa law, my finding that Dingman's use of force was objectively reasonable requires the entry of summary judgment for the defendants on Parrish's state law claims. *See Dooley v. Tharp*, 856 F.3d 1177, 1184 (8th Cir. 2017); *Lawyer v. City of Council Bluffs*, 240 F. Supp. 2d 941, 953 (S.D. Iowa 2002). Counts VI, VII, VIII and IX fail as a matter of law.

## VI. CONCLUSION

For the reasons set forth herein, defendants' motion (Doc. No. 21) for summary judgment (Doc. No. 21) is **granted** as to all claims. Because this order disposes of all claims, judgment shall enter against plaintiff and in favor of defendants and the Clerk of Court shall close this case.

**IT IS SO ORDERED.**

**DATED** this 17th day of November, 2017.

_____
Leonard T. Strand, Chief Judge